# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| JUDITH A. GARRETT, | ) | CASE NO. 1:17CV372 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | JONATHAN D. GREENBERG |
| NANCY A. BERRYHILL, | ) | |
| Acting Commissioner | ) | |
| of Social Security, | ) | **MEMORANDUM OF OPINION** |
| | ) | **AND ORDER** |
| Defendant. | ) | |

Plaintiff, Judith A. Garrett ("Plaintiff" or "Garrett"), challenges the final decision of

Defendant, Nancy A. Berryhill,[1] Acting Commissioner of Social Security ("Commissioner"),

denying her application for a Period of Disability ("POD") and Disability Insurance Benefits

("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 416(i), 423 *et seq.* ("Act"). This

Court has jurisdiction pursuant to 42 U.S.C. § 405(g) and the consent of the parties, pursuant to

28 U.S.C. § 636(c)(2). For the reasons set forth below, the Commissioner's final decision is

AFFIRMED.

## I. PROCEDURAL HISTORY

In May 2014, Garrett filed an application for POD and DIB, alleging a disability onset

date of March 21, 2014 and claiming she was disabled due to lupus, fibromyalgia, irritable bowel

---

[1] On January 23, 2017, Nancy A. Berryhill became the Acting Commissioner of Social
Security.

syndrome, chronic obstructive pulmonary disease, hypothyroidism, high blood pressure, depression, and acid reflux. (Transcript ("Tr.") at 19, 215, 238.) The application was denied initially and upon reconsideration, and Garrett requested a hearing before an administrative law judge ("ALJ"). (Tr. 120-128, 130-136, 137.)

On February 23, 2016, an ALJ held a hearing, during which Garrett, represented by counsel, and an impartial vocational expert ("VE") testified. (Tr. 41-88.) On October 5, 2016, the ALJ issued a written decision finding Plaintiff was not disabled. (Tr. 19-39.) The ALJ's decision became final on January 13, 2017, when the Appeals Council declined further review. (Tr. 2-6.)

On February 23, 2017, Garrett filed her Complaint to challenge the Commissioner's final decision. (Doc. No. 1.) The parties have completed briefing in this case. (Doc. Nos. 14, 16.) Garrett asserts the following assignments of error:

(1)     The ALJ committed reversible error by failing to consider Ms. Garrett's hypersomnia/narcolepsy under Listing 3.00P and 11.02.

(2)     The ALJ violated the treating physician rule, resulting in determinations at Step Four and Five that are not supported by substantial evidence.

(Doc. No. 14.)

## II.     EVIDENCE

### A.     Personal and Vocational Evidence

Garrett was born in July 1965 and was fifty (50) years-old at the time of her administrative hearing, making her a "person closely approaching advanced age" under social security regulations. (Tr. 32.) *See* 20 C.F.R. §§ 404.1563(d) & 416.963(d). She has at least a

high school education and is able to communicate in English.  (*Id.*)  She has past relevant work as a banking secretary.  (Tr. 32.)

**B.** **Relevant Medical Evidence**[2]

The record reflects Garrett has history of treatment for systemic lupus erythematous ("SLE"), fibromyalgia, and chronic bronchitis.[3]  (Tr. 302, 315.)  On January 6, 2014, Garrett presented to rheumatologist Matthew Bunyard, M.D., for follow-up regarding her chronic pain and fatigue.  (Tr. 328-338.)  She reported a variety of symptoms, including weakness, nausea, cough, muscle tenderness, back pain, headaches, dizziness, memory loss, night sweats, easy bruising, rash, and sun sensitivity.  (Tr. 329-330.)  On examination, Dr. Bunyard noted 5/5 muscle strength, normal pulses, normal reflexes, no edema, and no joint swelling or tenderness.  (Tr. 332.)  He also noted Garrett's lungs were clear.  (*Id.*)  Dr. Bunyard assessed fibromyalgia, noting the "diagnosis seems certain" and Garrett was "on maximum medication."  (*Id.*)  He also diagnosed possible SLE, Vitamin D deficiency, chronic gastrointestinal symptoms, and chronic paresthesias.  (*Id.*)  Dr. Bunyard noted Garrett had "high sleep scores" but was unable to complete a sleep study due to "insurance issues."  (*Id.*)

Later that month, Garrett presented to primary care physician James Kelly, M.D.  (Tr. 711-714.)  She reported "multiple things going on," including severe fatigue, body aches and

---

[2] The Court's recitation of the medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' Briefs.

[3] In August 2013 (seven months prior to her March 21, 2014 onset date), Garrett underwent a CT scan of her chest, which showed (1) mild upper lobe predominant emphysema; (2) mild bronchial wall thickening; (3) upper lobe predominant centrilobular ground-glass opacity; and (4) lower lobe predominant mosaic pattern of lung attenuation. (Tr. 315, 318.)  David Holden, M.D., interpreted this imaging as showing respiratory bronchiolitis interstitial lung disease and mild emphysema.  (*Id.*)

swelling, and increased burning and frequency during urination. (Tr. 711.) Dr. Kelly assessed a urinary tract infection, possible upper respiratory infection, and "exacerbation of" her lupus symptoms. (*Id.*) He also noted Garrett's "fatigue with possible narcolepsy and/or sleep apnea," and referred her to a psychiatrist. (*Id.*)

On March 6, 2014, Garrett began treatment with Basem Haddad, M.D., for evaluation of her daytime sleepiness. (Tr. 374-376.) She reported "a history of lethargy, daytime sleepiness, total sleep time of 6-8 [hours], and morning headaches." (Tr. 374.) On examination, Dr. Haddad noted Garrett's lungs were clear. (Tr. 375.) She had normal range of motion, muscle strength, and muscle tone, and her motor and sensory function, reflexes, gait and coordination were all intact. (Tr. 375-376.) Dr. Haddad assessed possible obstructive sleep apnea but noted other conditions needed to be considered, including restless leg syndrome, narcolepsy, and idiopathic hypersomnia. (Tr. 376.)

Dr. Haddad ordered a polysomnograph, which Garrett underwent on March 23, 2014. (Tr. 377-378.) This test showed no evidence of obstructive sleep apnea, oxygen desaturation, or significant leg movements. (Tr. 378.) After reviewing the results, Dr. Haddad recommended as follows:

1. Excessive daytime sleepiness cannot be attributed to obstructive sleep apnea based on this study and an alternative diagnosis should be sought. Differential diagnoses include insufficient sleep syndrome, narcolepsy, idiopathic hypersomnia, shift work disorder among others.

2. Consider correlation with a multi-sleep latency testing if the clinical suspicion for narcolepsy is high.

(*Id.*)

On April 1, 2014, Garrett presented to pain management physician Joseph Abdelmalak, M.D., for consultation regarding her chronic pain. (Tr. 339-350.) She reported "all over body pain," explaining as follows:

> The patient has had this pain since about 2003. She's seen multiple doctors for her chronic pain and now carries the diagnosis of fibromyalgia. She hurts everywhere and the only areas she doesn't have pain are her bilateral feet and face. The pain is described as a constant pain that is aching, numbness, tingling and cold at times now. Today, the pain intensity is rated as a 5 on a scale of 0-10. The pain intensity is rated 5 on the BEST day and a 10 on the WORST day. The pain is exacerbated by stress and physical activity. The pain is alleviated by medications, heat, and TENs. The patient reports 4-5 hours of uninterrupted sleep per night. She just had sleep study and is seeing sleep specialist who said she does not have sleep apnea but might have narcolepsy. Symptoms interfere with physical activity, work, walking, driving, cooking, household cleaning, lifting and social activities.

(Tr. 339.) On examination, Dr. Abdelmalak found 16 of 18 tender points, noting specifically "tenderness in all cervical paraspinals, SCMs, scalenes, trapezius bilaterally" and tenderness on palpation over all bilateral thoracic and paraspinal muscles. (Tr. 341-342, 343.) Motor strength and tone were 5/5 throughout, and Garrett's reflexes and sensation were normal. (Tr. 342.) Dr. Abdelmalak further noted Garrett could walk on her heels and toes, and tandem gait. (*Id.*) Her mood was depressed and her affect was flat. (*Id.*) Dr. Abdelmalak diagnosed fibromyalgia, SLE, and depression. (Tr. 344.) He advised Garrett to exercise and stop smoking, and referred her to physical therapy. (Tr. 343-344.)

Garrett presented for a Physical Therapy Spine Evaluation on April 8, 2014. (Tr. 888-895.) She reported "progressive complaints of bilateral shoulder and low back pain," as well as "constant numbness" in her left ulnar nerve distribution. (Tr. 888.) Garrett rated her neck and low back pain a 5 on a scale of 10 with medication, and an 8 on a scale of 10 without medication. (*Id.*) On examination, physical therapist Matthew Hixon, P.T., noted Garrett had a reduced

lumbar posture and left shoulder depression, and found she ambulated with a "forward flexed posture." (Tr. 889.) She had limited range of motion in her cervical and lumbar spines, and 4/5 strength in her shoulders, hips, and knees. (Tr. 889-890.) Therapist Hixon also noted tenderness over Garrett's bilateral upper trapezius muscles, and indicated she had difficulty balancing. (Tr. 890.) He found Garrett's problem list included impaired posture, and "impaired joint mobility, motor function, muscle performance, and [range of motion] associated with connective tissue dysfunction [and] spinal disorders." (Tr. 891.) Therapist Hixon recommended a home exercise program, as well as a six week course of physical therapy. (*Id.*)

On April 14, 2014, Garrett returned to Dr. Kelly, with complaints of shoulder radiculitis and diffuse fatigue. (Tr. 694.) On examination, Dr. Kelly noted cervical paravertebral spasms at C4, C5 and C6 on the left side and "grinding crepitus left shoulder," but found no radiculopathy or instability. (*Id.*) Deep tendon reflexes and motor function were within normal limits. (*Id.*) Dr. Kelly indicated Garrett's cervical radiculitis had improved but was not resolved, and advised her to continue physical therapy. (*Id.*)

The record reflects Garrett presented for physical therapy on at least twelve (12) occasions in April and May 2014. (Tr. 896-910, 364-366, 913-930.) Garrett generally reported continuing pain or soreness in her left shoulder and neck, as well as some numbness and tingling in her bilateral upper extremities. (*Id.*) At each visit, she rated her pain between a 4 and 6 on a scale of ten. (*Id.*) Garrett was generally able to complete her exercises without complaints of pain. (*Id.*) By the end of her course of physical therapy, Therapist Hixon found Garrett had increased range of motion and strength and had made "some progress toward her goals and is occasionally independent with her home exercise program." (Tr. 929-930.)

On April 18, 2014, Garrett presented for a mental health evaluation with psychiatrist Alf Bergman, M.D. (Tr. 439-442.) She reported experiencing "chronic or daily episodes of depression," including the following symptoms: feeling sad, decreased energy, constant fatigue, decreased sociability, decreased appetite, increased worrying, and occasional hopelessness and thoughts of "being better off dead." (Tr. 439.) Garrett stated she had never received mental health treatment, or been psychiatrically hospitalized. (Tr. 440.) She also reported pain in her shoulder, lower back, knee, and lower leg, which she described as constant, throbbing, and "moderate in intensity." (*Id.*)

On mental status examination, Garrett was "calm, friendly, downcast, attentive, fully communicative, well groomed, overweight, and relaxed." (Tr. 441.) Her speech was normal and her language skills were intact. (*Id.*) Dr. Bergman noted depressed mood and constricted affect. (*Id.*) Garrett's thinking was logical, her thought content was appropriate, and her short and long term memory was intact. (*Id.*) Garrett's social judgment appeared intact, and there were no signs of anxiety or "hyperactive or attentional difficulties." (*Id.*) Dr. Bergman also noted Garrett's muscle tone, gait, and station were normal. (*Id.*) He diagnosed major depressive disorder, single episode, moderate; and increased her dosage of Cymbalta. (Tr. 441-442.) Dr. Bergman also suggested Garrett see a sleep specialist or neurologist "to be evaluated for Narcolepsy." (Tr. 442.)

Garrett returned to Dr. Bunyard on April 25, 2014. (Tr. 351-363.) On examination, Dr. Bunyard noted Garrett appeared "healthy and well," with normal pulses and no edema or joint swelling. (Tr. 353.) He noted she did not have sleep apnea, and that her primary care physician "wonders about narcolepsy." (Tr. 351.) Shortly thereafter, on April 28, 2014, Garrett presented

to Dr. Kelly with complaints of "diffuse fatigue and tiredness" and anxiety/depression.  (Tr. 690-693.)  Dr. Kelly noted "[w]e will see about narcolepsy."  (Tr. 690.)

On May 6, 2014, Garrett returned to Dr. Haddad for treatment of her daytime sleepiness.  (Tr. 372-373.)  He assessed hypersomnia (severe, worsening), but indicated "other possibilities include her depression, fibromyalgia, SLE, narcolepsy, idiopathic hypersomnia, among others."  (Tr. 373.)  Dr. Haddad ordered another polysomnograph, which Garrett underwent on May 29, 2014.  (Tr. 368-369.)  This test found Garrett's "excessive daytime sleepiness cannot be attributed to obstructive sleep apnea," and indicated "the findings are suggestive of atypical narcolepsy or idiopathic hypersomnia." (Tr. 369.)  Garrett returned to Dr. Haddad on June 17, 2014.  (Tr. 370-371.)  He prescribed Provigil/Nuvigil, and advised Garrett to return in six months.  (Tr. 371.)

Garrett returned to Dr. Bergman on June 18, 2014.  (Tr. 443-444.)  She reported feeling "less sad" and denied recent feelings of worthlessness.  (*Id.*)  Garrett also stated she "feels most of her residual symptoms are due to [her] 'hypersomnia.'"  (*Id.*)  Dr. Bergman recommended she continue taking Cymbalta.  (Tr. 444.)

The next day, Garrett presented to orthopedist George Balis, M.D., with complaints of left shoulder pain.  (Tr. 402-407.)  Dr. Balis noted she had a "painful mass over the dorsum of the left shoulder," which had "recently become painful over the last month or so."  (Tr. 404.)  On examination, Dr. Balis found Garrett's sitting and standing postures were normal.  (*Id.*)  He noted her left shoulder was not swollen, hot or red, but had a 3 cm "firm tender not fluctuant mass over the left acromion."  (*Id.*)  Garrett had good range of motion in the left shoulder, along

with "excellent strength" and "excellent grip strength left hand." (*Id.*) An x-ray taken that date showed soft tissue mass/swelling over the acromion. (Tr. 405.) Dr. Balis ordered an MRI. (*Id.*)

On June 23, 2014, Garrett presented to the emergency room with complaints of central chest pain and "some sensation of numbness down her extremities." (Tr. 598-606.) On examination, Garrett's reflexes and pulses were normal and she exhibited 5/5 muscle strength in her upper and lower extremities. (Tr. 598-599.) Emergency room physician Lawrence Payne, M.D., noted "there is pain reproducible to the touch [in] the sternal area and she has pain with active use of bilateral upper extremities when testing her chest muscles." (Tr. 599.) Garrett underwent an EKG in the ER, which was normal; however, her white blood cell count was high. (*Id.*) A CT scan of her abdomen was normal, as was a chest x-ray. (Tr. 607, 608.) Dr. Payne indicated "at this point I have no indication that her chest pain is being caused by cardiac etiology [and it] appears to be completely musculoskeletal with reproducible pain on palpation." (Tr. 599.) Garrett wished to follow-up with her primary care physician, and was discharged. (*Id.*)

On June 24, 2014, Garrett underwent an MRI of her left shoulder, which revealed (1) minimal rotator cuff tendinosis with no evidence of a tear; (2) mild subdeltoid subacromial bursal thickening; and (3) a likely focal nodular area of subcutaneous fat. (Tr. 408-409.)

On July 25, 2014, Garrett returned to Dr. Bergman with an increase in her depressive symptoms. (Tr. 445-447.) On examination, Dr. Bergman noted that "signs of mild depression are present," including depressed mood and constricted affect. (Tr. 446.) He noted Garrett "continues to feel she has 'hypersomnia' and wants treatment with stimulant; she wants to continue treatment with Neurologist, not me." (*Id.*)

On August 25, 2014, Garrett underwent a "Functional Capacity Evaluation Assessment for Disability" with physical therapist Marie Soha, P.T. (Tr. 449-456.) Garrett reported whole body pain (including in her neck, shoulder, back, legs, arms, feet, and hands), fatigue and stress/depression. (Tr. 449-450.) She rated her pain a 6 on a scale of 10, and described it as "throbbing, shooting, stabbing, pressing, burning, tingling, aching, tender, exhausting, sickening, frightful, cruel, intense, radiating, numb, cold and dreadful." (Tr. 451-452.) Garrett indicated her pain was increased by sitting, walking, stress, physical activity, standing, and the weather; and alleviated by rest/bed and lying down. (Tr. 451.) Garrett estimated she could (1) sit for 15 minutes at a time; (2) sit for a total of 2 hours within an 8 hour period; (2) stand for 10 minutes at a time; (3) walk for 10 minutes at a time; and (4) stand/walk for a total of 2 hours in an 8 hour period. (Tr. 452.)

On examination, Ms. Soha found Garrett had poor posture, and ambulated with a slow cadence, often holding her right upper extremity. (Tr. 454.) Garrett had moderate limitations in her cervical and lumbar spines, and "some give-way weakness" in her lower extremities during manual muscle testing. (*Id.*) Ms. Soha also noted some edema in Garrett's right lower leg, as well as decreased light touch sensation on her left anterior thigh. (*Id.*) Ms. Soha then measured Garrett's observed functional tolerances. (Tr. 453.) She found Garrett could sit for a total of 65 minutes at one time without a break; stand/walk for 7 minutes total at one time without a break; and walk for 4 minutes and 20 seconds without a break. (*Id.*) Ms. Soha further found Garrett could lift and carry 7.5 pounds occasionally, 4.5 frequently, and 3.5 constantly. (Tr. 455.) She noted Garrett demonstrated a poor stair climbing tolerance, and poor ability to balance. (Tr.

449.)  Garrett was able to occasionally bend, squat, and reach.  (*Id.*)  Based on these results, Ms.

Soha placed Garrett at the sedentary physical demand level.  (*Id.*)

Finally, Ms. Soha assessed Garrett's overall effort and reliability as "fair," explaining as

follows:

**Effort Testing**:
1. Poor: Competitive test performance: Client did not display eagerness to begin tests or initiate physical tasks.

2. Good: Heart rate response with activity testing: Client did demonstrate increased heart rate with physical tasks which would be expected to increase cardiovascular demand if normal effort was applied.

3. Poor: Physical signs of effort client displayed during functional lift testing: Self limiting

**Reliability of Client Reports**:
1. Validity concerns with examples: Unusual/excessive pain behaviors:

2.  Poor: Reported vs observed  functional tolerances: Client's reports of her functional tolerances for standing and walking were greater than her observed tolerances during this exam. Client's report of her functional tolerance for sitting was less than her observed tolerance during this exam.

3. Good: Discrepancy between perceived abilities: Client's Perception of her functional ability was comparable as indicated on Pain Disability Index, Oswestry and Spinal Function Sort.

4. Good: Client's reports of pain on a 0-10 scale were comparable with those recorded on a 10 cm visual analog scale.

5. Poor: her UAB score indicated HIGH pain behaviors, whereas high pain behaviors may be associated with impaired reliability.

(Tr. 450, 455.)  In conclusion, Ms. Soha found Garrett would benefit from further rehabilitation,

including in a multidisciplinary chronic pain program.  (Tr. 450.)

On September 15, 2014, Garrett returned to Dr. Kelly.  (Tr. 664-669.)  She reported back

pain with right leg radiculopathy, and also complained of increased depression with anxiety.

(Tr. 664.)  On examination, Dr. Kelly found lumbar spine paravertebral spasm, tenderness over the right sciatic notch, positive straight-leg raise, and normal motor strength.  (Tr. 665-666.)  He determined Garrett was "definitely depressed," and noted "we did discuss having her see somebody at the ER and be admitted to the hospital if need be due to the depressive symptomatology."  (*Id.*)  Dr. Kelly stated "I am concerned for her well being," but indicated Garrett denied suicidal ideation and refused to go to the ER.  (*Id.*)

On October 16, 2014, Garrett returned to Dr. Bunyard.  (Tr. 556-569.)  She reported her body pain and fatigue were "still severe" and rendered her "unable to function."  (Tr. 556.)  Dr. Bunyard noted Garrett "has had disability disapproved by Liberty Mutual and SSI."  (Tr. 557.)  On examination, Dr. Bunyard found normal pulses and no edema, but observed tenderness to touch on Garrett's neck, low back and joints.  (Tr. 559.)  He also noted joint pain on range of motion, and indicated Garrett had difficulty walking and standing due to pain.  (*Id.*)  Dr. Bunyard concluded Garrett would "benefit from a formal, guided, graded conditioning program on land and in water."  (Tr. 560.)  He also stated as follows: "I support her disability at this point.  I do not believe she can work due to her pain and fatigue."  (*Id.*)

Shortly thereafter, on October 22, 2014, Garrett returned to Dr. Kelly.  (Tr. 657-663.)  She presented with dysphonia; i.e., a "barely audible voice even with straining." (Tr. 657.)  Dr. Kelly strongly advised her to quit smoking as soon as possible "for her own protection and good," and referred to her an ear, nose and throat specialist "ASAP."  (*Id.*)  He indicated he was concerned about laryngeal cancer.  (Tr. 658.)  Dr. Kelly stated he would not be "writing any letters about her disability," as he was "not trained in this." (Tr. 657.)

On October 30, 2014, Garrett presented to psychologist Sara Davin, Psy.D., for a pain medicine evaluation. (Tr. 570-573.) Garrett complained of "constant 'extreme and awful' total body pain," along with numbness in all her extremities. (Tr. 570.) She also reported sadness, depression, anhedonia, low energy, passive thoughts of suicide, and a sense of worthlessness, helplessness and hopelessness. (Tr. 571.) Garrett stated she spent a total of 22 hours per day reclining in a bed, reclining chair, or sofa. (*Id.*) On mental status examination, Dr. Davin noted as follows:

> The patient was reasonably cooperative. She whispered through most of the interview noting voice changes for unclear reasons and then her voice returned when she was crying. Eye contact was fair. Affect was depressed. Thoughts were logical and relevant without delusional thinking or hallucinations. Somatic preoccupation was extreme. She was not concerned about unanswered medical questions. There was no preoccupation with blame of others. There was no evidence of suicidality. Judgment and insight were fair. Attention span and concentration appeared normal. The patient was oriented to time, place and person.

(Tr. 573.) Dr. Davin concluded Garrett's prognosis was "unclear," and discussed with her participating in a Chronic Pain Rehabilitation Program with three to four weeks of "intensity day care." (*Id.*)

Garrett returned to Dr. Haddad on November 4, 2014. (Tr. 579-580.) She stated her symptoms were "a little better" on medication, and denied both cataplexy and hypnogogic hallucinations. (*Id.*) She did, however, report excessive daytime sleepiness with "occasional sleep paralysis." (*Id.*) Dr. Haddad assessed narcolepsy, without cataplexy; and indicated Garrett had shown a "fair response to current treatment." (*Id.*)

Later that month, Garrett presented to Dr. Kelly with complaints of swelling and tenderness over the left lateral posterior elbow area, along with "increased bruisability." (Tr. 628-630.) On examination, Dr. Kelly noted multiple purpura with bruising on Garrett's bilateral

forearms, positive calor over the elbows and wrists, and a 2 inch left elbow bursa with inflammation. (Tr. 628.) He assessed bursitis of the elbow, and advised Garrett to proceed to the ER in case of possible bacterial infection. (*Id*.) Garrett thereafter presented to the ER, where she was diagnosed with bursitis but "no signs of a septic joint" or infection. (Tr. 594-596.) She was treated with anti-inflammatories and discharged. (*Id*.)

In February 2015, Garrett complained of worsening back pain and requested admission to the Cleveland Clinic's Chronic Pain Rehabilitation Program. (Tr. 574.) Dr. Davin approved her request. (*Id*.)

On April 28, 2015, Garrett returned to Dr. Bunyard with complaints of continuing and severe joint and muscle pains. (Tr. 980-984.) On examination, Dr. Bunyard noted Garrett "appear[ed] tired." (Tr. 982.) She had joint pain on range of motion, and tenderness over her neck, shoulders, and hips. (*Id*.) Dr. Bunyard again noted: "I support her disability at this point. I do not believe she can work (even sedentary work) due to her pain and fatigue. I will write a letter to this point." (Tr. 984.)

On May 4, 2015, Garrett presented to neurologist Ika Noviawaty, M.D., for an evaluation of her "loss of consciousness episodes." (Tr. 1021-1030.) Garrett described her symptoms as follows:

> Last year, patient started falling asleep at work for approximately five hours and was asked to get medical evaluation by human resource department. Patient had sleep study done and was diagnosed with sleep apnea and narcolepsy. Nuvigil was started without success. She subsequently started having falls and loss of consciousness episodes with time lapse. The fall was during various situations, like falling off the chair, started talking gibberish at work and then passed out, sudden fall when walking. If coworkers call her, she would wake up. After the last episode few days ago, she felt upper left lip tingling that is still present now. When she woke up from an episode, she usually feels very tired and went back to sleep. Had bruises as the

result of the fall.  The frequency of passing out is few times/day and fall at least 7-8 times/year.  She feels that the frequency had increased in the past year.

(Tr. 1022.)  On examination, Dr. Noviawaty found Garrett was alert and oriented to person, place and time, and able to follow one and two step commands, with normal speech and full affect.  (Tr. 1024.)  She had 5/5 motor strength in her bilateral upper and lower extremities, as well as normal muscle tone, intact sensation, and normal gait.  (Tr. 1024-1025.)  Dr. Noviawaty determined Garrett "has recent history of loss of consciousness of unclear etiology, focal seizures vs. paroxysmal events."  (Tr. 1025.)  She recommended Garrett continue her medications and admission for diagnosis.  (*Id.*)

Shortly thereafter, on May 14, 2015, Garrett presented to Dr. Kelly for follow up regarding her "global fatigue" and neurological symptoms.  (Tr. 1002-1005.)  He again strongly advised Garrett to stop smoking, but noted she was "presently unable or unwilling to quit."  (Tr. 1002.)  On examination, he noted 1+ bilateral edema in her lower extremities, as well as a blunted affect.  (*Id.*)  Garrett apparently underwent an electrocardiogram that day, which was abnormal.  (*Id.*)  Dr. Kelly advised her to go to the hospital for evaluation.  (*Id.*)

That same day, Garrett presented to the ER for evaluation of her multiple syncopal episodes and loss of consciousness.  (Tr. 934-938.)  Examination revealed 1+ bilateral lower extremity edema and diffuse abdominal pain and tenderness, but was otherwise normal.  (Tr. 935.)  Garrett underwent a CT scan of her brain and a chest x-ray, both of which were normal.  (Tr. 937.)  ER physician Amanda Klukowski, D.O., assessed narcolepsy and hypomagnesemia and discharged Garrett in an "improved" condition.  (Tr. 938.)

On June 1, 2015, Garrett was admitted to the hospital for evaluation of her spells of unconsciousness.  (Tr. 1061-1087.)  She underwent continuous video electroencephalogram

("VEEG") during her three day hospital stay to monitor for epileptic seizures. (*Id.*) Hospital records reflect that, while it was "difficult for [Garrett] to stay awake," no epileptic seizures were noted. (Tr. 1085.) A sleep medicine doctor, Bogdan Strambu, M.D., was consulted, who determined as follows:

> Patient symptoms are not consistent with narcolepsy and the [polysomnograph/sleep study] findings are not consistent with the severity of her symptoms. The sleep study were done also when the patient had a very irregular sleep pattern. Sleep paralysis is one of Narcolepsy symptoms, although can be present in 25% of normal population. Patient has also severe sleep deprivation and she is sleeping only for 5-7 hours per night that can contribute to her complaints. Narcolepsy can't be ruled out at this time and she will need a [polysomnograph/sleep study] done in outpatient settings after she has a regular sleep schedule for at least 2 weeks and she is sleeping at least 7-9 hours per night. Other causes of hypersomnia likes seizure disorder needs to be ruled out first.

(Tr. 1073.) Garrett was also seen by a psychologist due to "high stress and depression." (Tr. 1085.) It was recommended she increase her Cymbalta and obtain mental health treatment on an outpatient basis. (*Id.*) Garrett was discharged in "fair" condition on June 4, 2015. (*Id.*) Later that month, Garrett requested an appointment with a psychiatrist, indicating she "just wants to die" and "life sucks." (Tr. 1038.)

On July 20, 2015, Garrett presented to cardiologist Caroline Casserly, M.D., for evaluation of her complaints of chest discomfort and dyspnea on exertion. (Tr. 947-953.) On examination, Garrett's lungs were clear and her heart rate and rhythm was normal. (Tr. 949.) Dr. Casserly also noted Garrett had a "steady gait" and her extremities were normal. (*Id.*) She ordered a echocardiogram and nuclear stress test to further evaluate Garrett's symptoms. (Tr. 950.) Garrett underwent these tests in July and August, 2015. (Tr. 957.) Dr. Casserly found the nuclear stress test was negative for ischemia, and the echocardiogram showed normal left ventricle function. (Tr. 957, 960.)

On August 11, 2015, Garrett present to Vaishal Shah, M.D., for a sleep medicine consultation. (Tr. 1106-1119.) Dr. Shah noted Garrett had been admitted to the hospital in June 2015 and underwent continuous EEG monitoring, which showed no seizures but continued sleepiness throughout the test. (Tr. 1106.) Dr. Shah also noted that "[a]t the time, she was thought to have severe hypersomnia which was due to sleep deprivation but narcolepsy couldn't be ruled out." (*Id.*) Since her hospital stay, Garrett indicated she continued to have 1-2 episodes of "passing out" daily without any precipitating events. (Tr. 1107.) On examination, Dr. Shah noted Garrett was alert and oriented, but labile with a flat affect. (Tr. 1110-1111.) He also noted normal muscle strength and tone, and normal reflexes. (Tr. 1111.) He concluded Garrett had "severe sleep deprivation related to psychological stressors and severe depression, which is likely main reason for hypersomnia although narcolepsy can't be ruled out." (*Id.*) Dr. Shah advised Garrett to consolidate her sleep, and address her depression and pain "as they may be significantly affect the results of testing." (*Id.*)

On August 24, 2015, Garrett presented for a psychiatry evaluation with Ngozi Nkanginieme, M.D. (Tr. 1039-1045.) On examination, Garrett was "drowsy but oriented to person, place, time and situation." (Tr. 1042.) She had fair eye contact and "was cooperative with the interview process but notably withdrawn with mild psychomotor retardation." (Tr. 1043.) Her mood was anxious, her affect constricted, and her speech was slow and soft with a "raspy tone." (*Id.*) Dr. Nkanginieme noted Garrett's thoughts were "mostly" linear "however, notably circumstantial when describing her various medical illnesses and physical symptoms." (*Id.*) Garrett denied suicidal intent, although "passive thoughts of death were in evidence." (*Id.*)

Dr. Nkanginieme diagnosed major depressive disorder (recurrent, severe); generalized anxiety disorder; rule out somatoform disorder; and personality disorder not otherwise specified. (Tr. 1045.)  She assessed a Global Assessment of Functioning ("GAF") of 45, indicating serious symptoms.[4]  (*Id.*)  Dr. Nkanginieme increased Garrett's Cymbalta and recommended she continue psychotherapy and follow up with Sleep, Neurology, Behavioral Sleep Medicine, and the Chronic Pain Rehabilitation Program.  (*Id.*)

On September 8, 2015, Garrett presented to psychologist Michelle Drerup, Psy.D., for a behavioral sleep medicine consult.  (Tr. 1120-1126.)  She reported her main problem was excessive daytime sleepiness, including episodes where she will "doze off" without awareness. (Tr. 1120.)  Garrett also complained of depressed mood, decreased energy, crying spells, and feelings of hopelessness, helplessness, and worthlessness.  (Tr. 1121.)  On examination, she was oriented to person, place and time, and appropriately groomed with a depressed mood, logical thought process, and raspy voice.  (Tr. 1123.)  Dr. Drerup noted Garrett's eyes were closed for a "significant portion" of the session, her psychomotor activity was slowed, and she had a "somatic focus."  (*Id.*)  She diagnosed hypersomnia and depression, and encouraged Garrett to keep a sleep log and attempt to get at least 8 hours of sleep per night.  (*Id.*)

---

[4]  The GAF scale reports a clinician's assessment of an individual's overall level of functioning.  An individual's GAF is rated between 0-100, with lower numbers indicating more severe mental impairments.  A GAF score between 41 and 50 indicates serious symptoms or any serious impairment in social, occupational or school functioning.  A recent update of the DSM eliminated the GAF scale because of "its conceptual lack of clarity . . . and questionable psychometrics in routine practice."  *See Diagnostic and Statistical Manual of Mental Disorders* (DSM-5) at 16 (American Psychiatric Ass'n, 5th ed., 2013).

On September 28, 2015, Dr. Bunyard completed a Physical Medical Source Statement. (Tr. 966-969.)  He stated he had first seen Garrett in March 2013, and had examined her approximately every six months since then.  (Tr. 966.)  Dr. Bunyard identified diagnoses of fibromyalgia, SLE, hypersomnia, and depression; and described her prognosis as "poor."  (*Id*.)  He indicated Garrett's symptoms included joint pain, muscle pain, and severe fatigue.  (*Id*.)  Dr. Bunyard characterized her pain as a "severe ache, constant, 10/10, diffuse, worse with activity;" and noted supporting clinical findings of joint/muscle tenderness and pain on range of motion. (*Id*.)  Although the form contained a series of questions asking for specific physical functional limitations, Dr. Bunyard did not complete these questions and, instead, stated "see attached FCE," which referred to physical therapist Marie Soha's August 2014 Functional Capacity Evaluation.  (Tr. 967, 970-977.)

In September 2015, Garrett presented on six occasions to an unidentified chiropractor at Parma Family Chiropractic.  (Tr. 883-885.)  At each visit, she complained of neck and upper back pain, as well as lumbar muscle spasms.  (*Id*.)  Examination typically revealed a "moderate degree of fixation" at C5, C7 and T3, and a severe amount of either hypertonic contraction or muscle tension/stiffness in the cervical paraspinal muscles.  (*Id*.)  Garrett's pain was generally described as "moderate."  (*Id*.)

On October 5, 2015, chiropractor Michael Kieklak (from Parma Family Chiropractic) completed a Physical Medical Source Statement.  (Tr. 877-880.)  He identified diagnoses of cervical subluxation (739.1), thoracic subluxation (739.2), and lumbar subluxation (739.3).  (Tr. 877.)  Dr. Kieklak listed Garrett's symptoms as lower back pain radiating down her legs, and neck pain radiation down her arms.  (*Id*.)  He noted supporting clinical findings as reduced range

of motion, tenderness to touch, pain in range of motion, and spasm. (*Id.*) Dr. Kieklak then offered the following opinions regarding Garrett's physical functional limitations:

- Garrett could walk 5 city blocks without rest or severe pain;

- She could sit for two hours at one time before needing to get up, and for a total of 6 hours in an 8 hour workday;

- She could stand for one hour at a time before needing to change position;

- She could stand/walk for a total of about 4 hours during an 8 hour workday;

- She would not need a job that permits shifting positions at will;

- She would need to walk for two minutes every hour during an 8 hour workday;

- She would need to take three unscheduled breaks during the workday due to pain/paresthesia and numbness, with each break lasting two minutes;

- She could frequently lift and carry less than 10 pounds, occasionally lift and carry 10 pounds, rarely lift and carry 20 pounds, and never lift and carry 50 pounds;

- She could occasionally twist and bend; rarely crouch/squat and climb stairs; and never climb ladders;

- She did not need to use a cane or other hand-held assistive device with occasional standing/walking;

- She would likely be off task for 5% of a typical workday;

- She would likely be absent about two days per month as a result of her impairments or treatment.

(Tr. 878-880.) Dr. Kieklak also determined Garrett would be capable of low stress work. (Tr. 880.)

On October 27, 2015, Garrett returned to Dr. Bunyard. (Tr. 1127-1140.) She reported her chronic pain was "still bad all over" and that she was still "sleepy" and suffering from abdominal pain. (Tr. 1127.) On examination, Dr. Bunyard noted Garrett "appear[ed] healthy and well." (Tr. 1129.) Her lungs were clear and her heart rate and rhythm was normal. (*Id.*) Dr. Bunyard found pain on range of motion in Garrett's shoulders, elbows, and wrists, but no swelling. (*Id.*)

On November 18, 2015, Garrett presented to Silvia Neme-Mercante, M.D., for a sleep medicine follow-up visit. (Tr. 1141-1148.) She denied hallucinations, automatic behavior, or sleep paralysis. (Tr. 1141.) Garrett described falling asleep while talking to people, in movie theatres, and sitting at a table, stating "on one occasion [she] fell asleep while she was trying to file some paperwork and she woke up on the ground." (*Id.*) On examination, she was alert, awake and oriented, with no edema, normal speech and mental status, and normal gait. (Tr. 1143.) Dr. Neme-Mercante diagnosed hypersomnia, and ordered an additional sleep study and an MRI of Garrett's brain. (*Id.*)

The following day, Garrett returned to Dr. Davin to be re-evaluated for the Chronic Pain Rehabilitation Program. (Tr. 1154-1162.) She complained of "extreme and awful total body pain," which she rated a 7 on a scale of 10. (Tr. 1154.) Garrett also reported numerous symptoms of depression, including sadness, anhedonia, fatigue, feelings of worthlessness, diminished concentration, and "passive death wishes." (Tr. 1156.) On examination, Dr. Davin noted Garrett was cooperative with good eye contact, flat affect, soft and hoarse speech, logical thought content, "extreme" somatic preoccupation, passive suicidal thoughts without plan or intention, normal attention span, and fair judgment and insight. (Tr. 1158-1159.) She diagnosed

(1) fibromyalgia by history; (2) lupus by history; (3) chronic low back pain by history; (4) chronic abdominal pain by history; (5) chronic pain syndrome; (6) hypersomnia by history; (7) somatic symptom disorder persistent, severe with predominant pain; (8) major depressive disorder, recurrent, severe without psychotic symptoms; and (9) generalized anxiety disorder. (Tr. 1159.)  Dr. Davin indicated Garrett would need to complete her gastroenterology consult and brain MRI before admission to the Chronic Pain Rehab Program could be considered.  (*Id.*)

Garrett underwent an MRI of her brain on December 1, 2015, which showed some chronic changes that "could reflect minimal chronic microvascular ischemia or demyelinating disease" but was otherwise normal.  (Tr. 1152-1153.)

On January 20, 2016, Garrett underwent a polysomnograph with EEG.  (Tr. 1149-1151.) This study showed (1) a normal EEG with no evidence of seizures or epilepsy; (2) primary snoring; and (3) abnormal sleep architecture likely due to medications and first night effect.  (*Id.*) Diagnoses of hypersomnia, primary snoring, and sleep stage dysfunctions were offered.  (*Id.*)

## C.      State Agency Reports

### 1.          Physical Impairments

On August 12, 2014, state agency physician Gerald Klyop, M.D., reviewed Garrett's medical records and completed a Physical Residual Functional Capacity ("RFC") Assessment. (Tr. 95-97.)  He found Garrett could lift and carry 50 pounds occasionally and 25 pounds frequently; stand and/or walk for about 6 hours in an 8 hour workday; and sit for about 6 hours in an 8 hour workday.  (Tr. 96.)  Dr. Klyop further concluded Garrett could never climb ladders, ropes, or scaffolds; but had an unlimited capacity to push/pull, balance, stoop, kneel, crouch, crawl, and climb ramps and stairs.  (*Id.*)  He found no manipulative, visual, or communicative

limitations, but opined Garrett would need to avoid all exposure to hazards (such as machinery, heights, etc.) due to her hypersomnia. (*Id.*)

On March 11, 2015, state agency physician Edmond Gardner, M.D., reviewed Garrett's medical records on reconsideration and submitted a Physical RFC Assessment. (Tr. 110-112.) He reached the same conclusions as Dr. Klyop, with the exception that he found Garrett could lift and carry only 20 pounds occasionally and 10 pounds frequently. (*Id.*)

### 2. Mental Impairments

On September 9, 2014, Garrett underwent a psychological consultative examination with Charles. F. Misja, Ph.D. (Tr. 457-463.) She reported the following health problems:

> She stated she has fibromyalgia, lupus, backaches, her arms, hands, legs and feet grow numb and she twitches. She has a sleeping problem. She can't stand for long periods of time and must switch sleeping positions every few minutes. Her neck is always "raw." She stated she can't think straight and is losing her memory. She reported feeling depressed and anxious and sometimes questions if she wants to live. The last time she worked was in March of this year.

(Tr. 458.) Garrett stated she had "never been hospitalized for a psychiatric problem but recently has seen a psychiatric doctor for depression and she stated she's had depression for many years." (Tr. 459.)

On mental status examination, Dr. Misja noted Garrett was "quiet and cooperative and did not appear to exaggerate symptoms." (Tr. 460.) She made good eye contact, expressed herself well, and "her speech was unremarkable and free from pathology such as loose associations." (*Id.*) Dr. Misja found Garrett's affected was constricted and her mood was "depressed and stable." (*Id.*) He found no indications of bizarre or unusual thought content typically associated with a thought disturbance. (Tr. 460-461.) Garrett rated her depression a 9 on a scale of 10 on "most days" and rated her anxiety as "about an 8-9." (*Id.*) She stated "she

has suicidal ideation but . . . has 'inner strength' because she has a four year old grandson who 'needs me very much.'" (Tr. 460.) Dr. Misja estimated Garrett was "probably functioning in the low average to average range of intelligence." (Tr. 461.) He found she has "solid" insight and judgment, and noted she "did not play the victim card." (*Id*.)

Dr. Misja diagnosed major depression, recurrent, severe; and anxiety disorder due to health problems. (*Id*.) He assessed a GAF of 55, indicating moderate symptoms. (Tr. 462.) In assessing her functional capabilities, Dr. Misja determined Garrett "will be able to understand and implement ordinary instructions." (*Id*.) He further concluded her abilities and limitations in the following areas "are likely to be in the minimal range:" (1) maintaining attention, concentration, persistence, and pace to perform simple and multi-step tasks; (2) responding appropriately to supervision and coworkers in a work setting; and (3) responding appropriately to work pressures in a work setting. (Tr. 462-463.)

On October 7, 2014, state agency psychologist Carl Tishler, Ph.D., reviewed Garrett's medical records and completed a Psychiatric Review Technique ("PRT"). (Tr. 94.) He concluded Garrett was mildly restricted in her activities of daily living and in her ability to maintain concentration, persistence, or pace; but had no limitations in her social functioning. (*Id*.) Dr. Tishler did not complete a Mental RFC Assessment.

On March 17, 2015, state agency psychologist Jennifer Swain, Psy.D. reviewed Garrett's medical records and completed a PRT and Mental RFC Assessment. (Tr. 109, 112-114.) In the PRT, Dr. Swain concluded Garrett was mildly limited in her activities of daily living and social functioning, and moderately limited in her ability to maintain concentration, persistence, and pace. (Tr. 109.) In the Mental RFC Assessment, Dr. Swain found Garrett was moderately

limited in her abilities to perform activities within a schedule, maintain regular attendance, be punctual within a customary tolerance, complete a normal workday without interruption from psychologically based symptoms, perform at a consistent pace without an unreasonable number and length of rest periods, and respond appropriately to changes in the work setting. (Tr. 113-114.) Dr. Swain explained "[t]he claimant retains the ability to sustain routine tasks in a setting where some flexibility is allowed as to the pacing of tasks and the scheduling of breaks." (Tr. 113.) She further opined Garrett "can sustain work in a relatively static setting." (Tr. 114.)

**D.      Hearing Testimony**

During the February 23, 2016 hearing, Garrett testified to the following:

- She lives alone. (Tr. 48-49.) She has a driver's license but only drives a couple times per week, and only for short distances. (Tr. 49.) If she were to attempt to drive for more than an hour, she would probably "doze off." (*Id.*)

- She worked for a bank for many years as a fiduciary associate. (Tr. 52, 66.) In this job, she answered phones, dealt with clients, conducted research, issued checks and wire transfers, etc. (Tr. 66.) She quit her job in March 2014 because she "couldn't stay awake" due to her hypersomnia. (Tr. 52.)

- Her hypersomnia causes her to sleep excessively during the day, and to "pass out" without warning. (Tr. 54, 57-58.) She naps almost every day, for two to three hours. (Tr. 56.) She also has episodes where she "passes out" with no warning, often causing her to fall down and hit either the floor or wall. (Tr. 53.) She first began experiencing hypersomnia symptoms in the last quarter of 2013. (*Id.*) When she was working, her sleeping episodes would only last for approximately 15 to 20 minutes because her co-workers would wake her up. (Tr. 70-71.) Now that she is no longer working, her sleeping episodes can last anywhere between one and four hours. (Tr. 70-71.) She takes medication for this condition, which makes her feel "a little bit more alert" but does not prevent her from "passing out." (Tr. 53, 59.)

- She also suffers from lupus and fibromyalgia, which cause generalized body pain. (Tr. 59.) She rated her pain a 6 ½ to 7 on a scale of 10, with medication. (*Id.*) If she weren't on pain medication, she would probably kill herself because it would be "so much pain." (*Id.*) She takes Lyrica, Cymbalta, and Wellbutrin for her pain. (Tr. 61.)

- She experiences elbow pain and swelling, as well as numbness in her arms, hands, and legs. (Tr. 70.) Her lower back hurts "all the time" and her stomach "feels like its going to explode." (*Id.*) She generally feels nauseous every day until about 2:00 p.m. (Tr. 72.) She sometimes experiences shortness of breath. (Tr. 61.) She smokes about a pack per day. (*Id.*) She experiences migraines two to three times per week, for which she takes prescription-strength Motrin. (Tr. 75.)

- She suffers from depression and anxiety. (Tr. 63.) She has difficulty concentrating after about twenty minutes, and has trouble finishing tasks. (Tr. 71-72.) She does not like to be around people. (Tr. 71.) These conditions are "controlled pretty good with medication" but she stated she still feels "very stressed out." (Tr. 63.)

- She can walk for about 10 minutes (or less than a block) before having to take a break, due to leg pain and numbness. (Tr. 62, 69, 74-75.) She can sit for a total of one hour but would need to change positions every 15 to 20 minutes because her legs start to feel numb. (Tr. 69.) She has difficulty climbing stairs because of her leg and knee pain. (Tr. 69.) In terms of lifting, a gallon of milk is heavy and hard for her to lift. (Tr. 62.)

- Although she lives alone, her son does the vacuuming, sweeping, mopping, and laundry. (Tr. 64-65.) Her sister does the yard work, and takes her grocery shopping. (*Id.*) She can do "a little bit of dishes" but then her back hurts and she has to sit down. (Tr. 64.) She can do simple meal preparation. (Tr. 65.)

The VE testified Garrett had past work as a banking secretary (sedentary but performed as medium, skilled, SVP 6). (Tr. 78.) The ALJ then posed the following hypothetical question:

So imagine a hypothetical individual . . . who is limited to the performance of light work[5] as defined under the regulations, except the individual should never climb

[5] "Light work" is defined as follows: "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities." 20 CFR § 404.1567(b). Social Security Ruling 83–10 clarifies that "since frequent lifting or carrying requires being on one's feet up to two-thirds of a workday, the full range of light work requires standing or walking, off or on, for a total of approximately six hours of an 8–hour workday." SSR 83–10, 1983 WL 31251 (1983).

> ladders, ropes, or scaffolds; she can occasionally climb ramps or stairs; she can . . . frequently balance, stoop, kneel, crouch, and crawl.  And she should avoid all exposure to hazards such as dangerous machinery and unprotected heights.  The individual is further limited to routine tasks with no strict time demands or strict production quotas and no more than minimal or infrequent changes in the work setting.  And finally, let's limit the individual to frequent interaction with the public, coworkers, and supervisors.

(Tr. 78-79.)

The VE testified the hypothetical individual would not be able to perform Garrett's past work as banking secretary but would be able to perform other representative jobs in the economy, such as office helper (light, unskilled, SVP 2); warehouse checker (light, unskilled, SVP 2); and mail clerk (light, unskilled, SVP 2).  (Tr. 80-81.)

The ALJ then posed a second hypothetical that was the same as the first but included a restriction to a sedentary[6] (as opposed to light) level of exertion.  (Tr. 81.)  The VE testified the hypothetical individual would be able to perform representative jobs in the economy such as surveillance system monitor (sedentary, unskilled, SVP 2); charge account clerk (sedentary, unskilled, SVP 2); and bench assembler (sedentary, unskilled, SVP 2).  (*Id.*)

Later, the ALJ clarified as follows:

> Q:      I forgot I wanted to include a limitation of avoiding concentrated exposure to fumes, odors, dusts, gases, and poorly ventilated

---

[6] "Sedentary work" is defined as follows: "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." 20 CFR § 404.1567(a).  SSR 83–10 provides that "Since being on one's feet is required 'occasionally' at the sedentary level of exertion, periods of standing or walking should generally total no more than about 2 hours of an 8–hour workday, and sitting should generally total approximately 6 hours of an 8–hour workday."  SSR 83–10, 1983 WL 31251 (1983).

areas. And I forgot to do that. But if that limitation were included under either of my two hypotheticals, would they change your answers in any appreciable way?

A:     None whatsoever, no changes at light or sedentary.

(Tr. 85.)

Garrett's counsel then asked the VE to assume the ALJ's first hypothetical (at the light exertional level) but added a limitation to "one unscheduled break lasting for an hour through an eight-hour day." (Tr. 82.) The VE testified there would be no competitive employment for such a hypothetical individual. (Tr. 83.) Counsel next asked the VE "[i]f someone were to be absent two days per month for various reasons, would they – would that person be able to maintain full-time employment?" (Tr. 83.) The VE testified there would be no competitive employment for such a hypothetical individual. (*Id*.) Counsel then asked the VE to assume the hypothetical individual would need to take three unscheduled breaks during an eight hour-work day, "lasting anywhere from between 15 to 20 minutes." (*Id*.) Once again, the VE testified there would be no competitive employment for such an individual. (*Id.*)

Finally, Garrett's counsel asked the VE the following:

Q:     Okay. Now let me ask you– I guess you'd have to speak at this using your experience and kind of general thoughts on the subject. I just would like to know generally, if you're in a work environment at, you know, the unskilled positions, so such as the examples that you had given – the bench assembler, the charge account clerk, and the surveillance system monitor, if you were to require – actually strike that "require." Let's say that a coworker or a supervisor would have to come by and frequently wake you up because of dozing off or sleep issues. How would that be, I guess, tolerated in those types of positions?

A:     In my experience of placing people in Ohio for the past 35 years, it would not be tolerated beyond the disciplinary guidelines per – of that employer, which is normally a once or twice verbal or written to tell you how to correct the problem and then a termination.

(Tr. 84-85.)

## III.   STANDARD FOR DISABILITY

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315 and 404.1505(a).1

A claimant is entitled to a POD only if: (1) she had a disability; (2) she was insured when she became disabled; and (3) she filed while she was disabled or within twelve months of the date the disability ended. 42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  20 C.F.R. §§ 404.1520(a)(4) *and* 416.920(a)(4).  *See also Ealy v. Comm'r of Soc. Sec*., 594 F.3d 504, 512 (6th Cir. 2010);  *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).  First, the claimant must demonstrate that he is not currently engaged in "substantial gainful activity" at the time of the disability application.  20 C.F.R. §§ 404.1520(b) *and* 416.920(b).  Second, the claimant must show that he suffers from a "severe impairment" in order to warrant a finding of disability.  20 C.F.R. §§ 404.1520(c) *and* 416.920(c).  A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities."  *Abbot*, 905 F.2d at 923.  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of

age, education or work experience. *See* 20 C.F.R. §§ 404.1520(d) *and* 416.920(d). Fourth, if the claimant's impairment or combination of impairments does not prevent him from doing his past relevant work, the claimant is not disabled. 20 C.F.R. §§ 404.1520(e)-(f) *and* 416.920(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled. 20 C.F.R. §§ 404.1520(g), 404.1560(c), *and* 416.920(g).

Here, Garrett was insured on her alleged disability onset date, March 21, 2014, and remained insured through December 31, 2018, her date last insured ("DLI.") (Tr. 19.) Therefore, in order to be entitled to POD and DIB, Garrett must establish a continuous twelve month period of disability commencing between these dates. Any discontinuity in the twelve month period precludes an entitlement to benefits. *See Mullis v. Bowen*, 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

### IV.    SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.    The claimant meets the insured status requirements of the Social Security Act through December 31, 2018.

2.    The claimant has not engaged in substantial gainful activity since March 21, 2014, the alleged onset date (20 CFR 404.1571 et seq.)

3.    The claimant has the following severe impairment: pulmonary emphysema, systemic lupus erythematosus (SLE), fibromyalgia, hypersomnia, obesity, depressive disorder, and anxiety disorder (20 CFR 404.1520(c)).

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, and 404.1526).

5.　　　After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except she should never climb ladders, ropes, or scaffolds; she can occasionally climb ramps or stairs; she can frequently balance, stoop, kneel, crouch, and crawl; she should avoid concentrated exposure to fumes, odors, dusts, gases, and poorly ventilated areas; and she should avoid all exposure to hazards, such as dangerous machinery and unprotected heights.  The claimant is further limited to routine tasks with no strict time demands or strict production quotas, and no more than minimal or infrequent changes in the work setting; and she is limited to frequent interaction with the public, coworkers, and supervisors.

6.　　　The claimant is unable to perform any past relevant work (20 CFR 404.1565).

7.　　　The claimant was born on July ** 1965 and was 48 years old, which is defined as a younger individual age 18-49 on the alleged disability onset date.  The claimant subsequently changed age category to closely approaching advanced age (20 CFR 404.1563).

8.　　　The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9.　　　Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.　　Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569(a)).

11.　　The claimant has not been under a disability, as defined in the Social Security Act, from March 21, 2014, through the date of this decision (20 CFR 404.1520(g)).

(Tr. 19-33.)

## V.  STANDARD OF REVIEW

"The Social Security Act authorizes narrow judicial review of the final decision of the

Social Security Administration (SSA)."  *Reynolds v. Comm'r of Soc. Sec.*, 2011 WL 1228165 at

* 2 (6th Cir. April 1, 2011).  Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards.  *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009).  Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).  In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence.  *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion.  *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999)("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.")  This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference.  *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g.,White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir.1996); accord *Shrader v. Astrue*, 2012 WL 5383120 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI. ANALYSIS

### Listings

In her first assignment of error, Garrett argues the ALJ "failed to perform any meaningful evaluation of [her] hypersomnia (at times called narcolepsy by her physicians) under the Listings of Impairments." (Doc. No. 14 at 12.) Specifically, Garrett complains the ALJ

failed to properly analyze her hypersomnia and/or narcolepsy under either section 3.00P for

sleep-related breathing disorders or "the most analogous disorder, epilepsy, Section 11.02." (*Id*.)

She maintains the ALJ's failure to consider these conditions under Sections 3.00P or 11.02 is not

harmless error in light of the medical evidence documenting her excessive daytime sleepiness

and fatigue, including the results of polysomnograms in March 2014, May 2014, and January

2016. (*Id*. at 14-15.)

The Commissioner asserts the ALJ did not err in failing to address Listings 3.00P or

11.02. (Doc. No. 16 at 9.) She first maintains "Listing 3.00P did not exist at the time of the

ALJ's decision, and thus there was no error in failing to mention it." (*Id*.) The Commissioner

argues Listing 3.00H is the relevant provision relating to sleep-related breathing disorders but

maintains that, regardless of which Listing was in effect at the time of the decision, Garrett's

argument fails because Garrett has not demonstrated she has a "sleep-related breathing disorder,

the initial requirement for either Listings 3.00P or 3.00H." (*Id*. at 9-10.) With regard to Listing

11.02, the Commissioner argues this listing is not relevant because the ALJ correctly determined

Garrett suffered from hypersomnia, which is a separate and distinct condition from narcolepsy.

(*Id*. at 10.) Even assuming Garrett had narcolepsy and Listing 11.02 was applicable, the

Commissioner argues remand is not required because Garrett has not demonstrated she either

meets or equals Listing 11.02. (*Id.* at 11.)

At the third step in the disability evaluation process, a claimant will be found disabled if

her impairment meets or equals one of the Listing of Impairments. 20 C.F.R. §§

404.1520(a)(4)(iii), 416.920(a)(4)(iii); *Turner v. Comm'r of Soc. Sec.*, 381 Fed. Appx. 488, 491

(6th Cir. 2010). The Listing of Impairments, located at Appendix 1 to Subpart P of the

regulations, describes impairments the Social Security Administration considers to be "severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience." 20 C.F.R. §§ 404.1525(a), 416.925(a). Essentially, a claimant who meets the requirements of a Listed Impairment, as well as the durational requirement, will be deemed conclusively disabled and entitled to benefits.

Each listing specifies "the objective medical and other findings needed to satisfy the criteria of that listing." 20 C.F.R. §§ 404.1525(c)(3), 416.925(c)(3). It is the claimant's burden to bring forth evidence to establish that his impairments meet or are medically equivalent to a listed impairment. *See e.g. Lett v. Colvin*, 2015 WL 853425 at * 15 (N.D. Ohio Feb. 26, 2015). A claimant must satisfy all of the criteria to "meet" the listing. *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 652 (6th Cir. 2009). "An impairment that manifests only some of those criteria, no matter how severely, does not qualify." *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990). A claimant is also disabled if her impairment is the medical equivalent of a listing, 20 C.F.R. §§ 404.1525(c)(5), 416.925(c)(5), which means it is "at least equal in severity and duration to the criteria of any listed impairment." 20 C.F.R. §§ 404.1526(a), 416.926(a).

Where the record raises a "substantial question" as to whether a claimant could qualify as disabled under a listing, an ALJ must compare the medical evidence with the requirements for listed impairments in considering whether the condition is equivalent in severity to the medical findings for any Listed Impairment. *See Reynolds v. Comm'r of Soc. Sec.*, 424 Fed. Appx. 411, 414-15 (6th Cir. 2011). In order to conduct a meaningful review, the ALJ must make sufficiently clear the reasons for her decision. *Id.* at 416-17.

Here, at step two, the ALJ determined Garrett suffered from the severe impairments of pulmonary emphysema, SLE, fibromyalgia, hypersomnia, obesity, depressive disorder, and anxiety disorder. (Tr. 22.) At step three, the ALJ determined Garrett's impairments or combination of impairments did not meet or equal the severity of a Listing. (Tr. 22-24.) Specifically, with regard to Garrett's physical impairments, the ALJ found as follows:

> The undersigned has carefully compared the claimant's signs, symptoms, and laboratory findings with the criteria specified in the Listings, placing particular emphasis on Listings 3.02 (chronic pulmonary insufficiency), 12.04 (affective disorders), 12.06 (anxiety-related disorders), 14.02 (systemic lupus erythematosus), and 14.09D (inflammatory arthritis).

> The claimant's pulmonary emphysema does not meet Listing 3.02 as the evidence does not document the requisite FEVl, FVC, single breath DLCO, or arterial blood gas values. Nor does the claimant meet listings 14.02 or 14.09D, as the record does not establish the requisite degree of joint, muscle, ocular, respiratory, cardiovascular, digestive, renal, hematologic, skin, neurological, or mental involvement or significant, documented, constitutional symptoms and signs of severe fatigue fever, malaise and weight loss with marked limitation in activities of daily living, social functioning, or completing tasks in a timely manner due to deficiencies in concentration, persistence, or pace.

> Although fibromyalgia is not listed as a specific impairment, consideration has been given to the Musculoskeletal System listings in section 1.00 and Listing 12.06 for Anxiety Related Disorders in accordance with SSR 12-2p. Similarly, while obesity is not a listed impairment, SSR 02-0lp and listing section 1.00Q provide important guidance on evaluating obesity in disability claims. The evaluator is required to consider obesity in determining whether a claimant has medically determinable impairments that are severe, in determining whether those impairments meet or equal any listing, and in determining the claimant's residual functional capacity. Obesity is considered severe when, alone or in combination with another medically determinable physical or mental impairment, it significantly limits an individual's physical or mental ability to do basic work activities (SSR 02-0lp). The undersigned has earlier found the claimant's obesity to be severe, but the signs, symptoms and laboratory findings of her obesity are not of such severity as found in any listing.

(Tr. 22-23.)

Garrett first maintains the ALJ erred in failing to evaluate her "hypersomnia/narcolepsy" under Listing 3.00P. This argument is without merit for the following reasons. As an initial matter, the Commissioner correctly notes Listing 3.00P was not in effect at the time of the ALJ's October 5, 2016 decision.[7] Rather, the applicable provision is Listing 3.00H, which provides as follows:

> Sleep-related breathing disorders (sleep apneas) are caused by periodic cessation of respiration associated with hypoxemia and frequent arousals from sleep. Although many individuals with one of these disorders will respond to prescribed treatment, in some, the disturbed sleep pattern and associated chronic nocturnal hypoxemia cause daytime sleepiness with chronic pulmonary hypertension and/or disturbances in cognitive function. Because daytime sleepiness can affect memory, orientation, and personality, a longitudinal treatment record may be needed to evaluate mental functioning. Not all individuals with sleep apnea develop a functional impairment that affects work activity. When any gainful work is precluded, the physiologic basis for the impairment may be chronic cor pulmonale. Chronic hypoxemia due to episodic apnea may cause pulmonary hypertension (see 3.00G and 3.09). Daytime somnolence may be associated with disturbance in cognitive vigilance. Impairment of cognitive function may be evaluated under organic mental disorders (12.02).

20 CFR Part 404, Subpart P, App. 1, Listing 3.00H.

The Court finds Garrett has not shown there is a "substantial question" as to whether she meets or equals the requirements of Listing 3.00H. *See Reynolds*, 424 Fed. Appx. at 414-15 (an ALJ need only address a listing "[w]here the record raises a 'substantial question' as to whether a claimant could qualify as disabled under" that listing.) While Garrett cites medical evidence demonstrating her lethargy and daytime sleepiness, she has not shown she suffers from a "sleep-related *breathing* disorder;" i.e., a disorder that is characterized by "periodic cessation of respiration associated with hypoxemia and frequent arousals from sleep." Listing 3.00H

---

[7] According to 81 Fed. Reg. 37138, Listing 3.00P became effective as of October 7, 2016. *See* 81 Fed. Reg. 37137 at 37145, 37152. *See also* POMS DI 34123.009 at http:secure.ssa.gov./apps10/poms.nsf/lnx/0434123009 (indicating Listing 3.00H was in effect until October 6, 2016.)

(emphasis added).  Indeed, none of the three polysomnograms Garrett underwent (in March 2014, May 2014, and January 2016) showed any evidence of obstructive sleep apnea or oxygen desaturation (i.e., abnormally low blood oxygen level or hypoxia).  (Tr. 377-378, 368-369, 1149-1151.)  Moreover, one of Garrett's physicians expressly noted her May 2014 polysomnogram did not show evidence of respiratory breathing problems.  (Tr. 1073.)  Lastly, Garrett has not directed this Court's attention to any medical or opinion evidence suggesting she suffers from a sleep-related breathing disorder as described in Listing 3.00H.  Thus, the Court finds Garrett has not shown there is a "substantial question" as to whether she meets or equals Listing 3.00H.  The ALJ, therefore, did not err in failing to address her hypersomnia under that listing.[8]

Garrett next argues the ALJ erred in failing to evaluate her narcolepsy under Listing 11.02.  She maintains "although narcolepsy and epilepsy are not truly comparable illnesses, when evaluating medical severity, the closest listing to equate narcolepsy with is Listing 11.02, Epilepsy."  (Doc. No. 14 at 15.)  Garrett asserts remand is required because the ALJ failed to evaluate whether her narcolepsy medically equals the requirements of Listing 11.02.

The Social Security Administration ("SSA") has defined narcolepsy as follows:

Narcolepsy is a chronic neurological disorder characterized by recurrent periods of an irresistible urge to sleep accompanied by three accessory events:

---

[8]  The Court further notes that, even if Listing 3.00P were in effect at the time of the ALJ decision, that listing also relates to "sleep-related breathing disorders (for example, sleep apnea) [that] are characterized by transient episodes of interrupted breathing during sleep, which disrupt normal sleep patterns" and "can result in disorders such as hypoxemia (low blood oxygen) and pulmonary vasoconstriction (restricted blood flow in pulmonary blood vessels.)."  *See* Listing 3.00P.  As Garrett has not shown any evidence her daytime sleepiness resulted in interrupted breathing during sleep, hypoxemia (low blood oxygen), or pulmonary vasoconstriction, she similarly fails to show a "substantial question" as to whether her hypersomnia meets or equals Listing 3.00P.

1.      Cataplexy—attacks of loss of muscle tone, sometimes with actual collapse, during which the individual always remains conscious.

2.      Hypnagogic hallucinations—hallucinations which occur between sleep and wakening.

3.      Sleep paralysis—a transient sensation of being unable to move while drifting into sleep or upon awakening. In addition, some persons have periods of automatic behavior and most have disturbed nocturnal sleep.

*See* POMS DI 24580.005 ("Evaluation of Narcolepsy) (eff. 9/26/16 - present).  The SSA further

explains as follows:

Although narcolepsy and epilepsy are not truly comparable illnesses, when evaluating medical severity, the closest listing to equate narcolepsy with is Listing 11.02, Epilepsy.

The severity of narcolepsy should be evaluated after a period of 3 months of prescribed treatment.  It is not necessary to obtain an electroencephalogram (EEG) in narcolepsy cases.  A routine EEG is usually normal, and when special attempts are made to obtain abnormal rapid eye movement (REM) sleep patterns, they may or may not be present even in true cases of narcolepsy.  Also, narcolepsy is not usually treated with anticonvulsant medication, but is most frequently treated by the use of drugs such as stimulants and mood elevators for which there are no universal laboratory blood level determinations available. Finally, it is important to obtain from an ongoing treatment source a description of the medications used and the response to the medication, as well as an adequate description of the claimant's alleged narcoleptic attacks and any other secondary events such as cataplexy, hypnagogic hallucinations or sleep paralysis.

*Id*.  Listing 11.02 provides as follows:

*Epilepsy– convulsive epilepsy, (grand mal or psychomotor), documented by detailed description of a typical seizure pattern, including all associated phenomena; occurring more frequently than once a month in spite of at least 3 months of prescribed treatment*.  With:

A.      Daytime episodes (loss of consciousness and convulsive seizures); or

B.      Noctural episodes manifesting residuals which interfere significantly with activity during the day.

Listing 11.02 (italics in original).

The Commissioner first argues Listing 11.02 is inapplicable because "the ALJ did not discuss narcolepsy as a severe impairment, instead opting for 'hypersomnia' as the best description of Garrett's symptoms." (Doc. No. 16 at 10.) She asserts "narcolepsy is a distinct medical impairment from idiopathic and recurrent hypersomnia," and argues the record does not support a finding of narcolepsy. (*Id*.) Garrett does not address this argument.

It is questionable from the medical record whether Garrett, in fact, suffers from narcolepsy. As noted above, the SSA has indicated narcolepsy is accompanied by cataplexy, hypnagogic hallucinations, and sleep paralysis. *See* POMS DI 24580.005 ("Evaluation of Narcolepsy) (eff. 9/26/16 - present). Garrett does not direct this Court's attention to any medical evidence indicated she experienced any of these events during the relevant time period. In fact, the record reflects Garrett consistently denied cataplexy and hypnagogic hallucination. (Tr. 374, 372, 579, 1106, 1067, 1073.) While some treatment notes from May and November 2014 indicate Garrett reported "occasional sleep paralysis," these self-reports are somewhat dubious in light of later treatment records from June 2015 stating Garrett reported only "one episode of sleep paralysis that lasted for 5 minutes a couple of years ago." (Tr. 1067, 1073.) Moreover, a careful review of the record indicates Garrett's physicians were unsure whether she suffered from narcolepsy and appeared to focus primarily on hypersomnia and/or chronic sleep deprivation. (Tr. 1111, 1073, 1106, 1143.)

Nonetheless, assuming *arguendo* Garrett does suffer from narcolepsy, the Court finds she has failed to demonstrate there is a "substantial question" whether this impairment medically equals the requirements of Listing 11.02.[9] Medical equivalence can be found in three ways: (1)

---

[9] Garrett has not shown she "meets" the requirements of Listing 11.02 because the record does not reflect she was ever diagnosed with epilepsy or suffered from seizures.

the claimant has a listed impairment but does not exhibit the specified severity or findings, yet has "other findings" that are "at least of equal medical significance" to the criteria; (2) the claimant has a non-listed impairment that is "at least of equal medical significance" to a listed impairment; or (3) the claimant has a combination of impairments which do not individually meet a Listed Impairment, but are "at least of equal medical significance" to a listing when viewed in totality.  20 C.F.R. § 404.1526.  *See also Reynolds*, 424 Fed. Appx. at 415; *Moran v. Comm'r of Soc. Sec.*, 40 F.Supp.3d 896, 922 (E. D. Mich 2014); *Postma v. Astrue*, 2012 WL 3912887 at * 6 (N.D. Ohio June 22, 2012), *report and recommendation adopted by* 2012 WL 3912858 (N.D. Ohio Sept. 7, 2012).

Here, Garrett has failed to articulate how the medical evidence relating to her sleep disorder is "at least of equal medical significance" to Listing 11.02.  While she states generally the ALJ should have evaluated her narcolepsy under this listing, Garrettt fails to offer any meaningful argument demonstrating her specific symptoms, treatment records/ history, and objective test results result in a finding of medical equivalence to Listing 11.02.  This is particularly problematic in light of Garrett's failure to direct this Court's attention to any evidence she suffered from the associated symptoms of narcolepsy (i.e., cataplexy, hypnagogic hallucinations, and/or sleep paralysis) during the relevant time period.  Moreover, Garrett has not identified any medical opinion evidence indicating she met or medically equaled the requirements of Listing 11.02.  Accordingly, the Court finds Garrett has not shown there is a "substantial question" as to whether she meets or equals Listing 11.02.  The ALJ, therefore, did not err in failing to address her sleep disorder under that listing.

---

Indeed, Garrett was evaluated for seizures via continuous video EEG monitoring during her June 2015 hospitalization and no seizure activity was noted.  (Tr. 1061-1087.)

41

For all the reasons set forth above, the Court finds Garrett's first assignment of error is without merit.

***Treating Physician Dr. Bunyard***

In her second assignment of error, Garrett argues the ALJ failed to articulate "good reasons" for rejecting the opinion of her treating rheumatologist, Dr. Bunyard. (Doc. No. 14 at 16-21.) She argues the ALJ "cherry-picked records and did not assign appropriate weight to one opinion provided by [Dr. Bunyard], and did not recognize or address the other consistent opinion evidence provided by the doctor." (*Id.* at 21.) In addition, Garrett asserts the ALJ improperly discounted Dr. Bunyard's opinions on the grounds Dr. Bunyard relied on the Functional Capacity Evaluation ("FCE") assessed by physical therapist Marie Soha. (*Id.* at 19.)

The Commissioner asserts the ALJ properly evaluated Dr. Bunyard's opinions. (Doc. No. 16 at 13-19.) She maintains the ALJ provided a number of good reasons for discounting his opinions, including inconsistencies between Dr. Bunyard's opinion and the medical evidence, as well as the fact he did not offer his own independent assessment of Garrett's functional limitations. (*Id.* at 16-17.)

A treating source opinion must be given "controlling weight" if such opinion (1) "is well-supported by medically acceptable clinical and laboratory diagnostic techniques" and (2) "is not inconsistent with the other substantial evidence in [the] case record." *Gayheart v. Comm'r of Soc. Sec.,* 710 F.3d 365, 376 (6th Cir. 2013); 20 C.F.R. § 404.1527(c)(2).[10] However, "a finding that a treating source medical opinion . . . is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to 'controlling weight,'

_____

[10] Revised versions of these regulations took effect on March 27, 2017 and apply to disability claims filed on or after that date. *See* 82 Fed. Reg. 5844 (March 27, 2017).

not that the opinion should be rejected." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399 (6th Cir.

2009) (quoting Soc. Sec. Rul. 96-2p, 1996 SSR LEXIS 9 at *9).  Indeed, "[t]reating source

medical opinions are still entitled to deference and must be weighed using all of the factors

provided in 20 C.F.R. § 404.1527 and 416.927." *Blakley*, 581 F.3d at 408.[11]  *See also Gayheart*,

710 F.3d at 376 ("If the Commissioner does not give a treating-source opinion controlling

weight, then the opinion is weighed based on the length, frequency, nature, and extent of the

treatment relationship, *id.,* as well as the treating source's area of specialty and the degree to

which the opinion is consistent with the record as a whole and is supported by relevant evidence,

*id*. § 404.1527(c)(2)-(6).")

       If the ALJ determines a treating source opinion is not entitled to controlling weight,

"the ALJ must provide 'good reasons' for discounting [the opinion], reasons that are 'sufficiently

specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating

source's medical opinion and the reasons for that weight.'" *Rogers v. Comm'r of Soc. Sec.*, 486

F.3d 234, 242 (6th Cir. 2007) (quoting Soc. Sec. Ruling 96-2p, 1996 SSR LEXIS 9 at * 5).  *See*

*also Gayheart*, 710 F.3d at 376.  The purpose of this requirement is two-fold.  First, a

sufficiently clear explanation "'let[s] claimants understand the disposition of their cases,'

particularly where a claimant knows that his physician has deemed him disabled and therefore

'might be bewildered when told by an administrative bureaucracy that she is not, unless some

---

[11] Pursuant to 20 C.F.R. § 404.1527(c)(2), when not assigning controlling weight to a treating physician's opinion, the Commissioner should consider the length of the relationship and frequency of examination, the nature and extent of the treatment relationship, how well-supported the opinion is by medical signs and laboratory findings, its consistency with the record as a whole, the treating source's specialization, the source's familiarity with the Social Security program and understanding of its evidentiary requirements, and the extent to which the source is familiar with other information in the case record relevant to the decision.

reason for the agency's decision is supplied.'" *Id.* (quoting *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004)). Second, the explanation "ensures that the ALJ applies the treating physician rule and permits meaningful appellate review of the ALJ's application of the rule." *Wilson*, 378 F.3d at 544. Because of the significance of this requirement, the Sixth Circuit has held that the failure to articulate "good reasons" for discounting a treating physician's opinion "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Rogers*, 486 F.3d at 243.

Nevertheless, the opinion of a treating physician must be based on sufficient medical data, and upon detailed clinical and diagnostic test evidence. *See Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985); *Bogle v. Sullivan*, 998 F.2d 342, 347-48 (6th Cir. 1993); *Blakley*, 581 F.3d at 406. The ALJ is not bound by conclusory statements of a treating physician that a claimant is disabled, but may reject such determinations when good reasons are identified for not accepting them. *King v. Heckler*, 742 F.2d 968, 973 (6th Cir. 1984); *Duncan v. Secretary of Health & Human Servs.*, 801 F.2d 847, 855 (6th Cir. 1986); *Garner v. Heckler*, 745 F.2d 383, 391 (6th Cir. 1984). According to 20 C.F.R. § 404.1527(d)(1), the Social Security Commissioner makes the determination whether a claimant meets the statutory definition of disability. This necessarily includes a review of all the medical findings and other evidence that support a medical source's statement that one is disabled. "A statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we will determine that you are disabled." *Id.* It is the Commissioner who must make the final decision on the ultimate issue of disability. *Duncan*, 801 F.2d at 855; *Harris*, 756 F.2d at 435; *Watkins v. Schweiker*, 667 F.2d 954, 958 n. 1 (11th Cir. 1982).

Here, Garrett cites two opinions authored by Dr. Bunyard. The first is contained in an April 2015 treatment note, in which Dr. Bunyard stated: "I support her disability at this point. I do not believe she can work (even sedentary work) due to her pain and fatigue." (Tr. 984.) The second is a Medical Source Statement regarding Garrett's physical functional limitations, completed by Dr. Bunyard in September 2015. (Tr. 966-969.) In that Statement, Dr. Bunyard identified diagnoses of fibromyalgia, SLE, hypersomnia, and depression; and described her prognosis as "poor." (Tr. 966.) He indicated Garrett's symptoms included joint pain, muscle pain, and severe fatigue. (*Id*.) Dr. Bunyard characterized her pain as a "severe ache, constant, 10/10, diffuse, worse with activity;" and noted supporting clinical findings of joint/muscle tenderness and pain on range of motion. (*Id*.) Although the form contained a series of questions asking for specific physical functional limitations, Dr. Bunyard did not complete these questions and, instead, stated "see attached FCE," which referred to physical therapist Marie Soha's Functional Capacity Evaluation. (Tr. 967, 970-977.)

Ms. Soha completed the FCE on August 25, 2014. (Tr. 449-456.) Garrett reported whole body pain (including in her neck, shoulder, back, legs, arms, feet, and hands), which she rated a 6 on a scale of 10. (Tr. 449, 451-452.) She estimated she could (1) sit for 15 minutes at a time; (2) sit for a total of 2 hours within an 8 hour period; (2) stand for 10 minutes at a time; (3) walk for 10 minutes at a time; and (4) stand/walk for a total of 2 hours in an 8 hour period. (Tr. 452.) On examination, Ms. Soha found Garrett had poor posture, and ambulated without an assistive device but with a slow cadence, often holding her right upper extremity. (Tr. 454.) Garrett had moderate limitations in her cervical and lumbar spines, and "some give-way weakness" in her lower extremities during manual muscle testing. (*Id*.)

Ms. Soha then measured Garrett's observed functional tolerances. (Tr. 453.) She found Garrett could sit for 65 minutes at one time without a break; stand/walk for 7 minutes at one time without a break; and walk for 4 minutes and 20 seconds without a break. (*Id.*) Ms. Soha further found Garrett could lift and carry 7.5 pounds occasionally, 4.5 pounds frequently, and 3.5 pounds constantly. (Tr. 455.) She noted Garrett demonstrated a poor stair climbing tolerance, and poor ability to balance. (Tr. 449.) Garrett was able to occasionally bend, squat, and reach. (Tr. 449-450.) Based on these results, Ms. Soha placed Garrett at the sedentary physical demand level. (Tr. 449.)

Finally, Ms. Soha assessed Garrett's overall effort and reliability as "fair." (Tr. 450.) She explained Garrett had "poor" competitive test performance due to the fact she "did not display eagerness to begin tests or initiate physical tasks." (Tr. 455.) She found Garrett was self-limiting during the functional lift testing, and rated her effort in that regard as "poor." (*Id.*) Ms. Soha also noted unusual/excessive pain behaviors which "may be associated with impaired reliability," and found some inconsistencies between Garrett's reported versus observed functional tolerances. (*Id.*)

The ALJ evaluated Ms. Soha's FCE and Dr. Bunyard's opinions as follows:

As for the physical opinion evidence, Marie Soha, a physical therapist, also completed a Functional Capacity Evaluation in August 2014. On questioning, the claimant did report significant limitations and during the physical examination, she indicated that she was unable to stand for more than 7 minutes or walk even 5 minutes due to pain and weakness in her legs. She also demonstrated poor tolerance of stair climbing and significant difficulty lifting even 10 pounds. Accordingly, Ms. Soha opined that the claimant's ability to perform functional tasks was at the sedentary exertional range (Exhibits 8F and 17F).

While such assessment is consistent with the clinical interview and objective findings during this evaluation, Ms. Soha noted that the claimant's testing effort

was poor, she exhibited unusual/excessive pain behaviors, and her reports of functional tolerances for standing and walking were somewhat greater than tolerances observed during the examination. Furthermore, the claimant's performance during this evaluation is inconsistent with other objective evidence, including the physical therapy progress notes, which generally reveal that the claimant was able to complete all exercises without complaints of pain (Exhibits 3F/42; 22F/ 11, 14, 17, 20, 23, 28, 31, 40, 43 and 25F/2). It is also worth noting that, while the claimant was apparently unable to stand or walk even 10 minutes during testing, she presented to this evaluation (and all other doctor's visits of record) without any assistive device (Exhibits 8F and 17F). Therefore, the undersigned finds that this assessment is entitled to limited weight.

In addition, the claimant' s rheumatologist, Matthew Bunyard, M.D., indicated in an April 2015 progress note that he did not believe the claimant could sustain even sedentary work due to her pain and fatigue (Exhibit 26F/7). He also completed a Medical Source Statement in September 2015, which echoes the restrictions suggested by Ms. Soha's assessment. Indeed, rather than filling out his own independent assessment form, Dr. Bunyard simply attached and referred to Ms. Soha's evaluation, which is entitled to limited weight for the reasons just discussed. Moreover, the few questions that Dr. Bunyard did directly respond to contain some inconsistencies. For example, he indicated that the claimant has "constant, 10/10" pain, but then contradicts this by saying that her pain is "diffuse" and is worse with activity (Exhibit 25F). Thus, Dr. Bunyard's opinion is accorded limited weight.

(Tr. 27.)

The Court finds the ALJ articulated good reasons for according Dr. Bunyard's opinions "limited weight." First, the ALJ correctly noted Dr. Bunyard did not complete his own independent assessment and, instead, "simply attached and referred to Ms. Soha's evaluation, which is entitled to limited weight for the reasons just discussed." (Tr. 27.) As set forth above, the ALJ accorded limited weight to Ms. Soha's evaluation for the following three reasons: (1) Ms. Soha found Garrett's testing effort was poor, she exhibited unusual excessive pain behaviors, and her self-reported functional tolerances for standing and walking were greater than observed during the FCE; (2) Garrett's performance during the FCE was inconsistent with other evidence of record including physical therapy notes showing Garrett was able to complete

exercises without pain; and (3) treatment records showing Garrett consistently presented to treatment visits without any assistive device. (*Id*.)

The above reasons are supported by substantial evidence. During the FCE, Ms. Soha noted several examples of Garrett's poor effort during the evaluation, including self-limiting behavior during the functional lift testing and a lack of eagerness to begin tests or initiate physical tasks. (Tr. 455.) She also expressly noted several unusual or excessive pain behaviors, including "grimacing, rubbing affected body part, solicited verbal complaints, unsolicited verbal complaints and changing positions." (Tr. 453.) Ms. Soha determined these pain behaviors impacted Garrett's reliability. (Tr. 450, 455.) The ALJ also correctly observed Ms. Soha identified discrepancies between Garrett's reported versus observed functional tolerances in sitting, standing, and walking. (Tr. 455.) In light of the above, the Court finds the ALJ did not err in discounting Dr. Bunyard's opinion on the grounds he relied entirely on a FCE in which Garrett was found to display poor effort and impaired reliability. *See e.g., Paul v. Astrue*, 827 F.Supp.2d 739, 745 (E.D. Ky. 2011) (finding ALJ properly discounted opinion on the basis treatment records showed poor effort and other evidence of questionable reliability); *Southerland v. Astrue*, 2010 WL 333673 at * 14-16 (S.D. Ohio Jan 21, 2010) (same).

Moreover, the ALJ also rejected Ms. Soha's FCE (and, by extension, Dr. Bunyard's September 2015 opinion) on the grounds Garrett's performance during the FCE was inconsistent with other objective evidence, including her physical therapy notes. (Tr. 27.) This reason is also supported by substantial evidence. While Garrett displayed very limited physical functional abilities during the August 2014 FCE, her physical therapy notes from April -May 2014 show she was able to complete all exercises without complaints of pain and generally showed

improved quality of movement at the end of each session.  (Tr. 897, 900, 903, 906, 909, 365, 914, 917, 928-929.)  Moreover, while Garrett was unable to stand or walk for 10 minutes during the FCE, treatment notes consistently noted she ambulated without an assistive device, calling into question Garrett's statements during the FCE that her "legs [were] going to give out."[12]  (Tr. 449, 454, 459, 375-376, 342, 441, 1024-1025, 949.)

Lastly, the ALJ rejected Dr. Bunyard's September 2015 opinion on the basis it contained "some inconsistencies."  (Tr. 27.)  In particular, the ALJ noted Dr. Bunyard found Garrett had "constant 10/10 pain, but then contradicts this by stating her pain is . . . worse with activity."  (Tr. 27.)  As the Commissioner notes, "the ALJ was correct to point this out because pain cannot be constantly a 10 out of 10 and yet still worse at times."  (Doc. No. 16 at 16.)  Moreover, the Court notes Garrett rated her pain a 6 to an 8 on a scale of 10 during the FCE and, further, consistently rated her pain a 6 on a scale of 10 during treatment visits with Dr. Bunyard.  (Tr. 335, 357, 449, 563, 1135.)

Based on the above, the Court finds the ALJ articulated good reasons for discounting Dr. Bunyard's September 2015 opinion and, further, that those reasons are supported by substantial evidence.  Moreover, with regard to Dr. Bunyard's April 2015 opinion Garrett could not sustain sedentary work and was disabled due to her pain and fatigue, the Court finds the ALJ expressly acknowledged this opinion (Tr. 27) and properly discounted it for the reasons set forth in connection with Dr. Bunyard's September 2015 opinion.  Further, to the extent Dr. Bunyard opined Garrett was "disabled," the ALJ properly rejected this opinion.  *See* 20 C.F.R. § 404.1527(d)(1) (explaining that the Commissioner makes the determination whether a claimant

---

[12] Many of Garrett's treatment records also include findings of normal or steady gait. (Tr. 459, 375-376, 342, 441, 1024-1025, 949.)

meets the statutory definition of disability and "[a] statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we will determine that you are disabled."); *Duncan*, 801 F.2d at 855 (stating it is the Commissioner who must make the final decision on the ultimate issue of disability); *Harris*, 756 F.2d at 435; *Watkins v. Schweiker*, 667 F.2d 954, 958 n. 1 (11th Cir. 1982).

Accordingly, and for all the reasons set forth above, the Court finds the ALJ properly evaluated Dr. Bunyard's April 2015 and September 2015 opinions. Garrett's second assignment of error is without merit.

## VII.    CONCLUSION

For the foregoing reasons, the Commissioner's final decision is AFFIRMED.

**IT IS SO ORDERED.**


  *s/Jonathan D. Greenberg*
  Jonathan D. Greenberg
  United States Magistrate Judge

Date: December 28, 2017